J. Gerard Stranch, IV
Joe P. Leniski, Jr.
Benjamin A. Gastel
**BRANSTETTER, STRANCH**
  **AND JENNINGS, PLLC**
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419

Joseph N. Kravec, Jr. (*pro hac* to be filed)
Wyatt A. Lison (*pro hac* to be filed)
**FEINSTEIN DOYLE PAYNE**
   **& KRAVEC, LLC**
429 Forbes Avenue
Allegheny Building, 17th Floor
Pittsburgh, PA 15219
Telephone:  (412) 281-8400

*Attorneys for Plaintiff and the Proposed Classes*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
(CHATTANOOGA)

| | | |
|---|---|---|
| JOSEPH V. BOZZELLI, Individually and on Behalf of all Persons Similarly Situated, | ) ) ) | |
| | ) | Civil Action No.: |
| Plaintiff, | ) ) | **CLASS ACTION COMPLAINT** |
| v. | ) ) | **DEMAND FOR JURY TRIAL** |
| VOLKSWAGEN GROUP OF AMERICA, INC, a New Jersey Corporation, | ) ) ) | |
| Defendant. | ) ) | |

## <u>CLASS ACTION COMPLAINT AND JURY TRIAL DEMAND</u>

Plaintiff Joseph V. Bozzelli ("Plaintiff"), by and through undersigned counsel, individual

and on behalf of all others similarly situated nationwide and throughout Pennsylvania, alleges the

following facts and claims upon personal knowledge as to matters relating to himself, and upon information and belief as to all other matters based upon the investigation of counsel as follows:

## INTRODUCTION

1.      This action is brought to remedy the breaches of contract, warranty, and violations of the law by Volkswagen Group of America, Inc. ("Volkswagen" or "Defendant") in connection with Volkswagen's sale of Volkswagen and Audi vehicles containing an emissions control defeat device used to evade emissions testing (hereinafter "Defeat Device").  This defeat device was installed and still remains in several Audi and Volkswagen models sold in the 2009 through 2015 model years and equipped with the "2.0 liter TDI® Clean Diesel" engine:

- o   Volkswagen Jetta, Jetta SportWagen (2009-2015)
- o   Volkswagen Beetle, Beetle Convertible (2009-2015)
- o   Audi A3 (2009-2015)
- o   Volkswagen Golf (2009-2015)
- o   Volkswagen Passat (2014-2015)
- o   Volkswagen Golf SportWagen (2015)

(Hereinafter collectively referred to as the "Vehicles").  Volkswagen deceptively advertised the Vehicles to indicate that they are cleaner for the environment and more fuel efficient than comparable cars, referring to them as "Clean Diesel" vehicles, when they are neither "clean" nor otherwise environmentally friendly.

2.      On September 18, 2015, following a lengthy investigation, the United States Environmental Protection Agency ("EPA") issued a notice of violation ("NoV") against Volkswagen Group of America, Inc., ("Volkswagen") finding that almost 500,000 vehicles equipped with the 2.0 liter TDI® Claim Diesel engine manufactured both by Audi and Volkswagen failed to meet federal and state emissions requirements.

3.      Volkswagen intentionally designed the defeat device for the express purpose of making the Vehicles appear to be in compliance with federal and state emissions laws during

emissions *testing*. However, Volkswagen's device was designed to allow the Vehicles to perform differently – including having increased horsepower and more efficient gas mileage – when operated for normal driving purposes. For years, Volkswagen marketed the 2.0 liter TDI® Clean Diesel cars as an alternative to traditional gas vehicles as well as electric and hybrid vehicles. Volkswagen did so by highlighting the fact that these "clean diesel" cars had much better mileage than traditional gas vehicles while having much better performance than hybrid or electric vehicles. In fact, as discovered by the EPA, the 2.0 liter TDI® clean diesel emitted nitrogen oxide at up to forty times the level allowed by applicable standards.

4.     The emission of nitrogen oxides ("NOx") is tightly regulated in the United States because NOx emissions have a variety of negative environmental impacts. Most significantly, by reacting with volatile organic compounds such as methane, NOx forms tropospheric ozone, which, in turn, can damage lung tissue in children, the elderly and asthmatics. In addition, once in the atmosphere, NOx gases react, forming smog and acid rain.

5.     As a result of Volkswagen's conduct, Plaintiff and hundreds of thousands of similarly situated Nationwide Class and Pennsylvania Subclass members (as defined below) purchased the Vehicles which emit unsafe and illegal amounts of dangerous gaseous chemicals. These dangerous vehicles will be subject to a recall so that the onboard computers that monitor and control vehicle emissions can be replaced or updated to put the vehicles in compliance with federal and state emissions requirements. Assuming that it is possible to make these vehicles compliant with emissions requirements, the changes made pursuant to a recall will negatively impact the performance and/or fuel economy of the vehicles, if not both. If it is not possible to modify these vehicles to bring them into compliance with emissions requirements, it is unclear

whether it will be legal to operate them. In either instance, the residual value of these vehicles has been substantially and negatively impacted.

6.      Plaintiff brings this complaint for himself and on behalf of similarly situated consumers seeking damages, restitution and injunctive relief for Volkswagen's deception, unlawful conduct and breaches of its contracts and warranties.

## PARTIES

7.      Plaintiff Joseph V. Bozzelli is an individual residing in Worthington, Pennsylvania. On or around August 30, 2010, Plaintiff purchased a new Volkswagen Model Year 2010 Jetta Sportswagen TDI, from Imports by Day, Inc. in Monroeville, Pennsylvania, an authorized Volkswagen and Audi dealership. Plaintiff still owns the vehicle. At the time Plaintiff purchased this vehicle, he was unaware that the vehicle was equipped with a Defeat Device that evaded applicable emissions requirements. Plaintiff purchased this vehicle based on representations made by Volkswagen regarding its performance, gas mileage, compliance with applicable regulations and fitness for use as a personal vehicle. As a result of Volkswagen's actions and its false statements, Plaintiff has suffered an ascertainable loss caused by, *inter alia*, out-of-pocket losses, future additional fuel costs, diminished performance of the vehicle and diminished residual and/or resale value of the vehicle.

8.      Defendant Volkswagen Group of America, Inc. is a New Jersey corporation with its principal place of business located at 2200 Ferdinand Porsche Dr., Herndon, Virginia. Volkswagen Group of America, Inc. manufactured and sold the Vehicles that included a Defeat Device at issue in this case.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. 1332(d), because the amount in controversy for the Class exceeds $5 million, exclusive of interest and costs, and there is diversity between most Class members and the Defendant.  Volkswagen is registered to do business in Pennsylvania, and regularly conducts business in Pennsylvania and within this judicial district.  This Court also has jurisdiction to decide claims brought under 15 U.S.C. § 2301 (the Magnuson- Moss Warranty Act) by virtue of 28 U.S.C. § 1332(a)-(d) and 28 U.S.C. § 1331.

10.     This Court has jurisdiction over Volkswagen because Volkswagen conducts business in Chattanooga, Tennessee and the district and has minimum contacts in the district or otherwise intentionally avails itself of the markets within the district through its promotion, sale, marketing, and distribution of its vehicles sufficient to render the exercise of jurisdiction by this Court proper and necessary.   Defendant also maintains a vehicle production facility in Chattanooga, Tennessee and manufactures Clean Diesel Vehicles in such facility.

11.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District. Volkswagen manufacturers vehicles, including Clean Diesel Vehicles at issue in this action, in this District.  Volkswagen also advertises, markets, sells and leases Clean Diesel Vehicles in this District.  In addition, at least one action arising from the same operative facts set forth herein is pending in this District.

## SUBSTANTIVE ALLEGATIONS

### Volkswagen Touts its Vehicles as Being Fuel Efficient and Environmentally Friendly

12.     Volkswagen has consistently marketed the 2.0 liter TDI® Clean Diesel equipped cars as fuel-efficient and environmentally friendly while still being performance oriented.  The

2.0 liter TDI® Clean Diesel, first introduced in 2009, was heralded as a significant technological improvement over older diesel engines. With its turbocharged direct injection ("TDI"), the 2.0 liter TDI® Clean Diesel was marketed as providing the same fuel economy that diesel engines had long been known for coupled with substantially enhanced performance, a no compromise mix of performance, fuel economy and clean emissions. The "technical innovation" of the 2.0 liter TDI® Clean Diesel engine was also touted by Volkswagen in marketing materials for its Audi line of cars. For example, the brochure for the 2015 Audi A3 provided a graphic explaining why the 2.0 liter TDI® Clean Diesel was "one of the most advanced diesel engines in the world."



13. Volkswagen's marketing of its diesel cars as being "Clean Diesel" in the United States was one of its core advertising and marketing messages. The 2012 Golf TDI Clean Diesel was marketed as a clean, performance oriented car.

> You may not know that the T in TDI stands for turbo, but you'll see why when you get behind the wheel. It's the perfect union of power, performance, and fuel

efficiency that delivers 140 hp and 236 lbs/ft torque for exceptional acceleration off the line, all while getting up to 42 mpg. That's up to 609 miles on one tank. Plus, the TDI Clean Diesel engine produces 90 percent fewer sooty emissions than previous diesel engines. That's what we like to call a win-win-win situation.

## TDI Clean Diesel





14.     Volkswagen combined its "Clean Diesel" message with promises of high fuel-efficiency without sacrificing performance compared to non-diesel vehicles.



15.     The 2013 Golf TDI Clean Diesel was sold as "Good, clean fun" with "236 lb/ft of torque for some serious oomph."  "But what's more amazing is what is doesn't give you: those

sooty emissions from years past. In fact, it has 90% fewer emissions than previous diesel engines." Volkswagen distinguished the TDI logo with a stripe of blue, explaining that "[t]he color blue symbolizes our commitment to building environmentally conscious cars that don't compromise performance. And setting a good example for eco-conscious behavior, everywhere, and every day."



This same Volkswagen marketing brochure claimed that in vehicles equipped with the 2.0 liter TDI® Clean Diesel engine, "you get a lot more of everything, without giving up anything," promising "up to 814 highway miles on a single tank of fuel" and "all that addictive torque."



16. Volkswagen's "Clean Diesel" advertising campaigns were successful as they helped Volkswagen become the top selling automobile manufacturer worldwide, selling more diesel cars in the U.S. than every other brand combined.

17. Volkswagen touted the fact that its Audi A3 TDI and Jetta TDI, two vehicles at issue in this action, were named 2010 Green Car of the Year and 2009 Green Car of the Year, respectively.

18. Brochures for the 2015 Volkswagen Jetta referred to the "efficient 2.0L TDI Clean Diesel engine" and highlighted claims of 46 MPG freeway gas mileage coupled with 236 pound feet of torque as indicia that the car was both "efficient" and "performance" oriented. Similarly, marketing material for the 2015 Volkswagen Bug highlighted the 2.0L TDI Clean Diesel engine, stated that "[s]aving has never been so fun. This available turbocharged diesel engine gets impressive mileage, along with putting out an equally impressive 236 lbs/ft of torque."

19. The 2015 Volkswagen Passat equipped with the 2.0L TDI® Clean Diesel was marketed both for its performance and fuel economy: "[w]ith up to 43 hwy mpg, it's easy to see why the TDI Clean Diesel gives the Passat more range than any other midsize sedan in its class.

And since it's turbocharged, we didn't have to sacrifice an ounce of power to be incredibly efficient."

20.     Volkswagen marketed the 2.0 liter TDI® Clean Diesel as a no-compromises engine, "Fast. Efficient. Stylish. Pick three."



**Fast. Efficient. Stylish. Pick three.**

With a TDI Clean Diesel engine, you get a lot more of everything, without giving up anything. The direct-injection engine of the Passat TDI was engineered to go the distance—up to 814 highway miles on a single tank of fuel.* Add in all that addictive torque and this will lead to road trip after road trip.

Volkswagen has sold more diesel cars in the U.S. than every other brand combined**
Turbocharged performance and efficiency†

21.     The combination of performance, fuel efficiency and "clean" emissions was constantly highlighted by VW.  Volkswagen's feigned concern for the environment went beyond the purported attributes of its vehicles.  For example, on the "Environment" page of its website, Volkswagen states that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel engines and developing

totally new power systems, which utilize new fuel alternatives."[1]  Further, the website for

Volkswagen Group of America highlighted its technology under "Environment," "TDI: Clean

Diesel for Everyone"

> Audi and Volkswagen pioneered TDI® clean diesel engines and today, the
> Volkswagen Group of America is *the market leader in clean diesel*. In 2013, Audi
> and Volkswagen sold more than 100,000 clean diesel cars in the United States.
> *Clean diesel delivers more torque, lower fuel consumption and reduces CO2*
> *emissions compared with equivalent gasoline engines*. Volkswagen's newest and
> most fuel-efficient TDI Clean Diesel engine will power the 2015 Golf, Beetle,
> Passat and Jetta starting in the second half of 2014.
>
> Audi has been at the forefront of clean diesel since the introduction of Audi TDI
> technology in 2009. Since then, nearly 40,000 Audi TDI vehicles have been sold in
> the United States, delivering an average of 30 percent better fuel economy and
> range than gasoline. Continuing our commitment to clean diesel technology and
> innovative solutions that improve efficiency and driving dynamics, Audi has made
> a dramatic expansion of TDI technology in the United States for the 2014 model
> year. Available TDI models include the A6, A7, A8 L, Q5 and Q7, as well as the
> introduction of the A3 TDI sedan.

http://www.volkswagengroupamerica.com/clean_diesel_tdi.html.

22.     Volkswagen also made specific representations about "Making diesel cleaner,"

claiming that the 2.0 liter TDI® Clean Diesel" developed by Audi "achieved ultra-low emissions

vehicle (Bin-5/ULEV II) status in all 50 states while reducing emissions by an average of 12%

compared to their gasoline equivalents." Volkswagen asserted that "[w]ith innovative diesel

particulate filters and the nontoxic AdBlue® reducing agent, we eliminate 95% of diesel NOx

emissions."  According to Volkswagen this, coupled with the increased fuel efficiency of diesel

resulted in an engine that gets "30% more mpg than comparable gasoline engines."

23.     Prior to the publication of the EPA's NoVs, Volkswagen had won wide praise for

its implementation of the 2.0 liter TDI® Clean Diesel engine.  The 2011 Golf was named by the

Kelley Blue Book ("KBB"), one of the most widely relied on used car pricing guides, as one of

---

[1] http://update.vw.com/environment/index.htm.

the "Top 10 Green Cars" of 2011. KBB noted that the 2.0 liter TDI® Clean Diesel was "capable of delivering quick launches and 42 highway miles per gallon." In addition, the Volkswagen Golf was named the 2015 Car of the Year by Motor Trend magazine. In naming the Golf, Motor Trend highlighted the performance and fuel economy of the 2.0 liter TDI® Clean Diesel engine.

> Even more impressive, Volkswagen has also included room in the line-up for diesel . . . versions of the Golf. The Golf TDI and its 2.0-liter turbo-diesel inline-four return an EPA combined rating of 36mpg . . . . The best part is that neither car is a penalty box to drive. What the TDI lacks in horsepower it mostly makes up for in torque. While it didn't feel quite as quick as the TSI, it was no slouch for a C-segment car.

Motor Trend further noted that "[n]o matter which Golf variant we jumped into, we emerged with smiles on our faces . . . . [w]e were also impressed with the powertrains in our Golf variants – from the TDI's torquey low-end surge to the GTI's rev-happy rush, there wasn't a dud in the group."

24.     Volkswagen's false claims regarding its diesel engines continued through at least two versions of the 2.0 liter TDI® Clean Diesel engine. For example, in 2014, as Volkswagen marketed a revised diesel engine slated for inclusion in 2015 models, Douglas Skorupski, Volkswagen's manager of technical strategy, described the 2015 revision to the 2.0 liter TDI® Clean Diesel, dubbed the "EA288" engine, as "continuing to improve and will be even cleaner and more fuel-efficient and powerful." An article published by JD Power and Associates on March 19, 2014, noted that "Volkswagen says that the new engine produces fewer emissions, boasts improved throttle response, and experiences less internal friction, the latter enhancement contributing to better fuel-economy numbers." The article went on to note that:

> [t]his is an important engine for Volkswagen. Last year, one out of every four VWs sold in the United States was equipped with a TDI Clean Diesel engine, according to the company, and together with VW Group's luxury brand Audi, more than 100,000 TDI Clean Diesel vehicles hit American roads.

Even while revising and updating the 2.0 liter TDI® Clean Diesel engine between the 2009 through 2015 model years, Volkswagen continued to include, in each revision, the illegal defeat device that allowed it to appear compliant with federal and state emissions requirements. And throughout this period, under normal operation, the 2.0 liter TDI® Clean Diesel engine produced levels of NOx that were as much as 40 times higher than the levels allowed for under applicable emissions standards.

25. Despite Volkswagen's advertisements that its "Clean Diesel" cars could emit low emissions while maintaining high fuel-efficiency without sacrificing performance, the Vehicles were rigged to produce low (legal) emissions levels only during *testing,* not during *driving* conditions.

### Volkswagen Deceived Consumers about Unlawful Emission Levels in its "Clean Diesel" Vehicles

26. From 2009 to the present, Volkswagen manufactured and sold vehicles in the United States equipped with turbocharged direct injection, referred to by Defendant as TDI, diesel engines.

27. The U.S. Clean Air Act and implementing regulations administered by the EPA require automobile manufacturers, including Volkswagen, to ensure that diesel vehicles sold in the U.S. comply with the Clean Air Act. 42 U.S.C. § 7401-7671q.

28. From 2008 to the present, Volkswagen TDI "Clean Diesel" Vehicles had a software Defeat Device installed that detected when the Vehicles were undergoing emissions testing.

29. During emission testing, the Defeat Device activated pollution control devices installed in the Vehicles to enable the Vehicles to pass emission testing.

30. When the Vehicles were otherwise operational, i.e., being driven normally and

not undergoing emission testing, the Defeat Device did not activate pollution controls and, under normal driving conditions, allowed the Vehicles to emit pollution critically exceeding U.S. standards.

31.     Use of a defeat device such as the one used by Volkswagen is illegal under U.S. laws and regulations. The EPA NoV, attached hereto as "Exhibit A," provides a detailed summary of the history, purpose and application of federal regulation of vehicle emissions pursuant to the Clean Air Act and the EPA's treatment of defeat devices.

> In creating the CAA, Congress found, in part, that "the increasing use of motor vehicles ... has resulted in mounting dangers to the public health and welfare." CAA § 101(a)(2), 42 U.S.C. § 740 1(a)(2). Congress' purpose in creating the CAA, in part, was "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population," and "to initiate and accelerate a national research and development program to achieve the prevention and control of air pollution." CAA § 101(b)(1)-(2), 42 U.S.C. § 7401 (b)(l)-(2). The CAA and the regulations promulgated thereunder aim to protect human health and the environment by reducing emissions of nitrogen oxides (NOx) and other pollutants from mobile sources of air pollution. Nitrogen oxides are a family of highly reactive gases that play a major role in the atmospheric reactions with volatile organic compounds (VOCs) that produce ozone (smog) on hot summer days. Breathing ozone can trigger a variety of health problems including chest pain, coughing, throat irritation, and congestion. Breathing ozone can also worsen bronchitis, emphysema, and asthma. Children are at greatest risk of experiencing negative health impacts from exposure to ozone.

> *   *   *

> Light-duty vehicles must satisfy emission standards for certain air pollutants, including NOx. 40 C.F.R. § 86.1811-04. The EPA administers a certification program to ensure that every vehicle introduced into United States commerce satisfies applicable emission standards. Under this program, the EPA issues certificates of conformity (COCs), and thereby approves the introduction of vehicles into United States commerce.

> To obtain a COC, a light-duty vehicle manufacturer must submit a COC application to the EPA for each test group of vehicles that it intends to enter into United States commerce. 40 C.F.R. § 86.1843-0 I. The COC application must include, among other things, a list of all auxiliary emission control devices (AECDs) installed on the vehicles. 40 C.F.R. § 86.1844-01(d)(ll). An AECD is "any element of design which senses temperature, vehicle speed, engine RPM,

transmission gear, manifold vacuum, or any other parameter for the purpose of activating, modulating, delaying, or deactivating the operation of any part of the emission control system." 40 C.F.R. § 86.1803-01. The COC application must also include "a justification for each AECD, the parameters they sense and control, a detailed justification of each AECD that results in a reduction in effectiveness of the emission control system, and [a] rationale for why it is not a defeat device." 40 C.F.R. § 86.1844-01 (d)(11).

\* \* \*

The CAA makes it a violation "for any person to manufacture or sell, or offer to sell, or install, any part or component intended for use with, or as part of, any motor vehicle or motor vehicle engine, where a principal effect of the part or component is to bypass, defeat, or render inoperative any device or element of design installed on or in a motor vehicle or motor vehicle engine in compliance with regulations under this subchapter, and where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." CAA § 203(a)(3)(B), 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. § 86.1854-12(a)(3)(ii). Additionally, manufacturers are prohibited from selling, offering for sale, introducing into commerce, delivering for introduction into commerce, or importing, any new motor vehicle unless that vehicle is covered by an EPA-issued COC. CAA § 203(a)(1), 42 U.S.C. § 7522(a)(1); 40 C.F.R. § 86.1854-12(a)(I). It is also a violation to cause any of the foregoing acts. CAA § 203(a), 42 U.S.C. § 7522(a); 40 C.F.R. § 86-1854-12(a).

32.     The deviation between emissions while the Vehicles were undergoing emissions testing and while the Vehicles were under normal driving conditions was first discussed in a report by investigators from West Virginia University's Center for Alternative Fuels, Engines & Emissions ("CAFEE") on May 15, 2014.[2]  Vehicles tested by CAFEE showed that under normal driving conditions, the vehicles emitted up to forty (40) times the federally allowed NOx limits.

33.     NOx is an environmental pollutant that can cause emphysema, bronchitis, and other respiratory diseases.

34.     West Virginia University and the International Counsel for Clean Transportation, which participated in the CAFEE study, brought their concerns about the increased emissions to

---

[2] See "In-use emissions testing of light-duty diesel vehicles in the U.S." available online at http://www.theicct.org/sites/default/files/publications/WVU_LDDV_in-

the EPA and the California Air Resources Board sometime in 2014. However, the results of the CAFEE study were not widely publicized or known by the general public.

35. The EPA and the California Air Resources Board conducted their own investigation of the Vehicles to determine the cause of the deviation. During this investigation, Volkswagen told environmental regulators for more than a year that discrepancies between pollution tests on its Vehicles and the higher levels reported by the CAFEE report were technical error and not attempts to evade U.S. regulations.[3] In other words, Volkswagen actively concealed the presence of a Defeat Device installed in the Vehicles for the purpose of circumventing U.S. emission standards.

36. In early September, after several months of discussions between Volkswagen and regulators, Volkswagen admitted to regulators that it has, since model year 2009, employed the Defeat Device to circumvent EPA and California emission test procedures.[4]

37. On September 18, 2015, the EPA issued a Notice of Violation ("NoV") to Volkswagen detailing the Defeat Device used in the Vehicles, as well as Volkswagen's various violations of EPA laws and regulations. Amongst the violations listed in the NoV, Volkswagen failed to disclose or describe the presence of the Defeat Device in its EPA applications for certificates of conformity, making the sale of the Vehicles unlawful.

---

use_ICCT_Report_Final_may2014.pdf.

[3] *See* "It Took E.P.A. Pressure to Get VW to Admit Fault," available online at http://www.nytimes.com/2015/09/22/business/it-took-epa-pressure-to-get-vw-to-admit-fault.html?_r=0.

[4] *See* September 18, 2015 letter from Mary D. Nichols, Chair of California's Air Resources Board, to Volkswagen, available online at http://www.arb.ca.gov/newsrel/in_use_compliance_letter.htm.

38.     In its very first paragraph, the EPA NoV concluded that "*[t]hese defeat devices bypass, defeat, or render inoperative elements of the vehicles' emission control system that exist to comply with [Clean Air Act] emission standards*.   Therefore, VW violated section 203(a)(3)(B) of the [Clean Air Act], 42 U.S.C. § 7522(a)(3)(B)."

39.     The NoV indicated the following Vehicles contained the unlawful Defeat Device that allowed the vehicles to pass emissions testing despite emitting far greater NOx than permitted by law:

    a.  Model Year 2009-2015 Volkswagen Jetta, 2.0 liter diesel engine;

    b.  Model Year 2009-2014 Volkswagen Jetta SportWagen, 2.0 liter diesel engine;

    c.  Model Year 2010-2015 Volkswagen Golf, 2.0 liter diesel engine;

    d.  Model Year 2010-2015 Audi A3 2.0 liter diesel engine;

    e.  Model Year 2012-2015 Volkswagen Passat, 2.0 liter diesel engine;

    f.  Model Year 2012-2015 Volkswagen Beetle, 2.0 liter diesel engine; and

        Model Year 2012-2015 Volkswagen Beetle Convertible, 2.0 liter diesel engine.

40.     Volkswagen sold nearly 500,000 of the Vehicles in the U.S. from 2008 to the present, and approximately 11 million worldwide.

41.     Volkswagen installed the Defeat Device intentionally to make it appear as if the Vehicles complied with U.S. emissions standards when, during normal operation, the Vehicles did not.

42.     Volkswagen advertised that the Vehicles had fuel-efficiency and performance that would not be possible if the emission control devices were fully operative.

43.     While Volkswagen has been ordered by the EPA to design a fix to the Defeat Device so that the Vehicles will comply with EPA regulations when operating normally, such a

fix would negatively affect the Vehicles' fuel-efficiency and performance.

44. As a result of the NoV, on September 18, 2015 Volkswagen ceased all production of its TDI "Clean Diesel" vehicles, and told all of its authorized dealerships in the U.S. to immediately stop selling the Vehicles.

45. Only after the NoV was issued did Volkswagen's international parent corporation publically admit that the Defeat Device in the Vehicles was programmed into the Vehicles' software to evade U.S. emissions laws.[5]

46. In the aftermath of the EPA's NoV, on September 22, 2015, the Volkswagen Group acknowledged the problem with the Vehicles that affects some 11 million cars worldwide, indicating the company is setting aside 6.5 billion Euros ($7.2 billion) to correct the problems in the Vehicles, and "to win back the trust of [its] customers."[6]

47. Moreover, on September 23, 2015, the chief executive of Volkswagen's international parent corporation, Martin Winterkorn, resigned, stating "I am shocked by the events of the past few days. Above all, I am stunned that misconduct on such a scale was possible in the Volkswagen Group."[7]

48. As a result of Volkswagen's deceptive conduct, consumers paid a premium for purportedly "Clean Diesel" vehicles which promised to provide a certain level of fuel-efficiency

---

[5] *See* "It Took E.P.A. Pressure to Get VW to Admit Fault," located online at http://www.nytimes.com/2015/09/22/business/it-took-epa-pressure-to-get-vw-to-admit-fault.html?_r=0.

[6] See September 22, 2015 Press Release located online at http://www.volkswagenag.com/content/vwcorp/info_center/en/news/2015/09/Volkswagen_AG_has_issued_the_following_information.html

[7] See "Volkswagen CEO quits amid emissions-cheating scandal," located online at http://www.washingtonpost.com/business/economy/volkswagen-ceo-resigns-after-emissions-cheating-scandal-spreads/2015/09/23/6b09e540-6203-11e5-8e9e-dce8a2a2a679_story.html.

and performance, while being "green" and within compliance of U.S. and states' emission requirements. The premiums for Volkswagen's "Clean Diesel" Vehicles, based on its suggested retail prices between the same non-diesel vehicles, ranges between a low-end of $1,000, to over $6,000.

## CLASS ACTION ALLEGATIONS

49. Plaintiff brings this action on behalf of a Nationwide Class and Pennsylvania Subclass pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), which class and subclass consists of persons who purchased a Volkswagen or Audi 2.0 liter TDI vehicle containing a Defeat Device as follows:

> All persons in the United States who purchased or leased any of the following TDI diesel vehicles from a Volkswagen-authorized dealership: Model Year 2009-2015 Volkswagen Jetta; Model Year 2009-2014 Volkswagen Jetta SportWagen; Model Year 2010-2015 Volkswagen Golf; Model Year 2010-2015 Audi A3; Model Year 2012-2015 Volkswagen Passat; Model Year 2012-2015 Volkswagen Beetle; and Model Year 2012-2015 Volkswagen Beetle Convertible (the "Nationwide Class").

> All persons in Pennsylvania who purchased or leased any of the following TDI diesel vehicles from a Volkswagen-authorized dealership: Model Year 2009-2015 Volkswagen Jetta; Model Year 2009-2014 Volkswagen Jetta SportWagen; Model Year 2010-2015 Volkswagen Golf; Model Year 2010-2015 Audi A3; Model Year 2012-2015 Volkswagen Passat; Model Year 2012-2015 Volkswagen Beetle; and Model Year 2012-2015 Volkswagen Beetle Convertible (the "Pennsylvania Subclass").

50. Excluded from the Nationwide Class and Pennsylvania Subclass are: (i) Volkswagen Group of America, Inc., including any entity in which Volkswagen Group of America, Inc. has a controlling interest, is a parent or subsidiary, or which is controlled by Volkswagen Group of America, Inc., as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Volkswagen Group of America, Inc.; and (ii) the judges to whom this action is assigned and any members of their immediate families.

51.     The members of the Nationwide Class and Pennsylvania Subclass are so numerous that joinder of all members is impracticable.  Plaintiff believes that the number of Nationwide Class members is in excess of 400,000, and the number of Pennsylvania Subclass members is in excess of 1,000.  Nationwide Class and Pennsylvania Subclass members can be identified from the records retained by Volkswagen Group of America, Inc. and/or its authorized dealers.

52.     Plaintiff will fairly and adequately represent and protect the interests of all Nationwide Class and Pennsylvania Subclass members.  Plaintiff has retained competent counsel experienced in consumer class action litigation in both state and federal courts nationwide, including over intentional automobile defects, and intends to prosecute this action vigorously.

53.     Plaintiff's claims are typical of those of the other members of the Nationwide Class and Pennsylvania Subclass because (a) he owns a Volkswagen TDI vehicle with a 2.0 liter engine that has a Defeat Device programmed into its computer, and (b) the harm sustained by Plaintiff and all Nationwide Class and Pennsylvania Subclass members arises from and was caused by the same course of conduct in which Volkswagen Group of America, Inc. engaged. Plaintiff does not have interests that are antagonistic to or in conflict with the Nationwide Class or Pennsylvania Subclass.

54.     Common questions of law and fact exist as to all members of the Nationwide Class and Pennsylvania Subclass, and these common questions of law and fact predominate over questions solely affecting individual members of the Class.  Common questions include:

(a)     Whether Volkswagen engaged in the conducted alleged herein;

(b)     Whether Volkswagen designed, advertised, marketed, distributed, leased, sold, or otherwise placed Affected Vehicles into the stream of commerce in the United States;

(c)        Whether Volkswagen's Vehicles contain a Defeat Device that does not comply with U.S. EPA requirements;

(d)        Whether Volkswagen knew about the Defeat Device and, if so, how long Volkswagen has known;

(e)        Whether Volkswagen designed, manufactured, marketed, and distributed Vehicles with a Defeat Device;

(f)        Whether Volkswagen breached its contracts or warranties with customers who purchased or leased the Vehicles;

(g)        Whether Volkswagen's conduct violates consumer protection statutes, warranty laws, and other laws as asserted herein;

(h)        Whether Volkswagen's Vehicles' engine systems can be made to comply with EPA standards without materially degrading the performance and/or fuel efficiency of the Vehicles;

(i)        Whether Plaintiff and the other Nationwide Class and Pennsylvania Subclass members overpaid for their Vehicles;

(j)        Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief and, if so, in what amount; and

(k)        Whether Plaintiffs and the other Class members are entitled to equitable relief, including, but not limited to, restitution or injunctive relief.

55.     By designing the Vehicles with a Defeat Device and advertising the Vehicles as having certain fuel-efficiency and performance together with promised EPA emissions compliance, Volkswagen acted or refused to act on grounds that apply generally to the Nationwide Class and Pennsylvania Subclass so that final injunctive relief or corresponding declaratory relief is appropriate with respect to the Classes as a whole.

56.     Common questions of law or fact predominate over individual questions because consumers who purchased Volkswagen Vehicles with the Defeat Devices were adversely affected by Volkswagen's failure to honor its contracts to provide Vehicles with the promised fuel-efficiency, performance and emissions.

57.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the harm suffered by individual Nationwide Class or Pennsylvania Subclass members may be relatively small, the expense and burden of individual litigation make it virtually impossible for individuals to seek redress for the wrongful conduct alleged.  Moreover, absent class treatment, there is a risk of inconsistent judgments by different courts hearing the identical claims of over 500,000 vehicle owners.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

58.     Further, in the alternative, the Nationwide Class and Pennsylvania Subclass may be maintained as class actions with respect to particular issues, pursuant to Fed.R.Civ.P. 23(c)(4).

### The Discovery Rule/Concealment

59.     Plaintiff did not discover earlier that Volkswagen had installed a Defeat Device in his Volkswagen Clean Diesel Vehicle, and had no reason to believe that Volkswagen failed to provide a vehicle that did not comply with EPA emissions regulations when being driven normally.  Volkswagen did not provide Plaintiff, the Nationwide Class or Pennsylvania Subclass with sufficient information about its proprietary software that contained the Defeat Device so that they would suspect or could discern Volkswagen's conduct described herein until, at the earliest, September 18, 2015.

60.     In fact, Volkswagen sold the Vehicles making direct statements that the Vehicles complied with EPA regulations through advertising and in its contracts, and that the Vehicles had specific fuel-efficiency, performance, in addition to its emissions compliance, yet failed to disclose to owners or lessees of the Vehicles that Volkswagen installed a Defeat Device so that

they would not comply with EPA emissions standards when operating normally, and that removing the Defeat Device would result in a vehicle that did not have the promised fuel-efficiency and performance.

61.     Plaintiff and the general public only learned on September 18, 2015 that Volkswagen had installed Defeat Devices in the Vehicles when the EPA issued its Notice of Violation to Volkswagen.

62.     Therefore, any otherwise applicable statutes of limitation are tolled from the date Volkswagen first began selling its TDI Clean Diesel Vehicles that contained a Defeat Device until September 18, 2015 under the Discovery Rule and/or concealment doctrine.

## COUNT I –
## BREACH OF CONTRACT

63.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

64.     This Count is brought on behalf of Plaintiff and the Nationwide Class.

65.     Plaintiff and other Nationwide Class members purchased or leased Model Year 2009-2015 Volkswagen Jetta; Model Year 2009-2014 Volkswagen Jetta SportWagen; Model Year 2010-2015 Volkswagen Golf; Model Year 2010-2015 Audi A3; Model Year 2012-2015 Volkswagen Passat; Model Year 2012-2015 Volkswagen Beetle; and Model Year 2012-2015 Volkswagen Beetle Convertible at dealerships acting as authorized agents for Volkswagen for the purpose of selling Volkswagen vehicles directly to the public.   As evidenced by the invoices or window stickers, the sales contracts between Plaintiff and the Nationwide Class and Volkswagen show that these vehicles were purchased with Clean Diesel TDI 2.0 liter engines with certain specified fuel-efficiency, performance, and EPA-compliant emissions.

66.     Volkswagen breached these sales contracts with Plaintiff and each Nationwide

Class member by selling these Vehicles equipped with Defeat Devices which did not allow the vehicles to have EPA-compliant emissions when operating normally.

67.     Even if Volkswagen has not breached an express provision of its sales contracts, it has still breached the implied covenants of good faith and fair dealing with regard to Plaintiff and the Nationwide Class under their contracts by selling the vehicles with Defeat Devices in violation of federal laws and regulations.

68.     As a direct and proximate result of the foregoing conduct, Plaintiff and Nationwide Class members have suffered economic losses, warranting compensatory damages as well as injunctive relief, declaratory relief and other equitable relief deemed just and proper by the Court.

## COUNT II –
## VIOLATION OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1, *et seq.*

69.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

70.     This Count is brought on behalf of Plaintiff and the Pennsylvania Subclass for violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201, *et seq.*

71.     Plaintiff and Pennsylvania Subclass members purchased or leased their Volkswagen Vehicles for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

72.     Volkswagen's acts described herein were performed in "trade" or "commerce" within the meaning of 73 P.S. § 201-2(3).

73.      The UTPCPL prohibits unfair or deceptive acts or practices of any trade or

commerce, including (i) "Representing that goods or services have ... characteristics, ... benefits or quantities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another;" (iii) "Advertising goods or services with intent not to sell them as advertised;" (iv) "Failing to comply with the terms of any written guarantee or warranty given to the buyer at, prior to or after a contract for the purchase of goods or services is made;" and (v) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding."

74.     Volkswagen used unfair and deceptive acts and practices by installing the Defeat Device into its TDI "Clean Diesel" Vehicles, causing the Vehicles to comply with EPA emission laws only when the Vehicles were being tested for emissions, but otherwise not complying with EPA emission laws when operating normally.

75.     Volkswagen knew that the Vehicles did not comply with EPA requirements as a result of the Defeat Device, and that it was selling vehicles that were unlawful under U.S. environmental laws and regulations.

76.     Volkswagen actively concealed the presence of the Defeat Device from Plaintiff, the Pennsylvania Subclass and regulators, and deceived Plaintiff and Pennsylvania Subclass members into thinking the Vehicles complied with EPA emission requirements when under normal operating conditions.

77.     Volkswagen engaged in unfair and deceptive acts or practices, including (i) misrepresenting that its TDI "Clean Diesel" Vehicles had characteristics, benefits or qualities they did not have; (ii) misrepresenting that its TDI "Clean Diesel" Vehicles are of a particular standard, quality or grade that they are not; (iii) advertising its TDI "Clean Diesel" Vehicles with intent not to sell them as advertised; (iv) failing to comply with the terms of its written guarantee

or warranty given to purchasers and lessees of the TDI "Clean Diesel" Vehicles prior to or after the purchase or lease of the Vehicles; and (v) engaging in fraudulent and deceptive conduct that created a likelihood of confusion or misunderstanding about the Vehicles.

78. By failing to disclose and by actively concealing the Defeat Device in the Vehicles, Volkswagen engaged in unfair and deceptive business practices in violation of the UTPCPL.

79. Volkswagen's unfair and deceptive acts or practices were likely to, and in fact did deceive Plaintiff and reasonable consumers, about the efficiency of the Vehicles' engines and compliance with U.S. environmental regulations.

80. Volkswagen knew or should have known that its conduct violated the UTPCPL.

81. Plaintiff and Pennsylvania Subclass members suffered ascertainable loss of money or property as a result of Volkswagen's unlawful activities described herein.

82. As a direct and proximate result of the foregoing conduct, Plaintiff and Pennsylvania Subclass members have suffered damages, warranting an award of up to three times the actual damages sustained as well as injunctive relief or $100, whichever is greater, declaratory relief and other equitable relief deemed just and proper by the Court.

## COUNT III –
## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT, 15 U.S.C. §§ 2301, *et seq.*

83. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

84. This Count is brought on behalf of Plaintiff and the Nationwide Class.

85. The Magnuson-Moss Warranty Act ("MMWA") creates a private federal cause of action for breach of a "written warranty" as defined by the Act. 15 U.S.C. § 2301(6) and §

2310(d)(1).

86.     Volkswagen's Vehicles are "consumer products" as defined in 15 U.S.C. §

2301(1), as they constitute tangible personal property which is distributed in commerce and

which is normally used for personal, family or household purposes.

87.     Plaintiff and members of the Nationwide Class are "consumers" as defined in 15

U.S.C. § 2301(3), since they are buyers of Volkswagen's Vehicles for purposes other than resale.

88.     Volkswagen is engaged in the business of making the Vehicles available, either

directly or indirectly, to consumers such as Plaintiff and the Nationwide Class.  As such,

Volkswagen is a "supplier" as defined in 15 U.S.C. § 2301(4).

89.     Volkswagen offered a written warranty to consumers relating to the performance,

fuel-efficiency and emissions of the Vehicles.  As a result, Volkswagen is a "warrantor" within

the meaning of 15 U.S.C. § 2301(5).

90.     Volkswagen made an implied warranty to consumers relating to the lawfulness of

the Vehicles' emissions within the meaning of 15 U.S.C. § 2301(7).

91.     Volkswagen provided a "written warranty" within the meaning of 15 U.S.C. §

2301(6) for the Vehicles by specifying the performance, fuel-efficiency and emissions in the

Vehicles as described in this complaint.  These affirmations of fact regarding the performance,

fuel-efficiency and emissions of the Vehicles constituted, and were intended to convey to

purchasers, a written promise that the Vehicles would have the promised performance, fuel-

efficiency and emissions while the Vehicle were in normal operating conditions.  As such, these

written promises and affirmations were part of the basis of Plaintiff's and Nationwide Class

Members' bargains with Volkswagen in purchasing the Vehicles.

92.     Volkswagen breached its written warranty to Plaintiff and the Nationwide Class

by failing to provide Vehicles with the promised performance, fuel-efficiency and emissions by virtue of the inclusion of the unlawful Defeat Device that ensured the Vehicles only had the promised emissions levels while undergoing emission testing, and not while operating normally. Since the Vehicles did not have the performance, fuel-efficiency and emissions promised by Volkswagen's written warranty, the Vehicles were not defect free and did not comply with Volkswagen's obligations under the written warranty to supply vehicles that met federal emission standards.

93.     Plaintiff is entitled to bring this action as a class action pursuant to 15 U.S.C. § 2310(e), and is not required to provide Volkswagen notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff pursuant to Federal Rule of Civil Procedure 23.

94.     In this case, providing Volkswagen a reasonable opportunity to cure its breach of written warranties is futile and unnecessary. At the time of sale or lease of each Vehicle, Volkswagen knew, should have known, or was reckless in not knowing of the inclusion of the Defeat Device that was specifically designed to evade U.S. emissions laws.  Volkswagen nonetheless failed to rectify the situation and/or to disclose the true nature of the "Clean Diesel" engine.  Moreover, Volkswagen was notified of the problem with the Vehicles in 2014, more than 9 months before the filing of this action, by independent groups and regulators, but nonetheless failed to rectify the situation or to disclose the existence of the Defeat Device in the Vehicles.  Under the circumstances, Volkswagen had a reasonable opportunity to cure the problem with the Vehicles, and Plaintiff is excused from the requirement to provide further notice to Volkswagen to cure the defects in the Vehicles prior to filing this action.

95.     Plaintiff and members of the Nationwide Class were injured by Volkswagen's

failure to comply with its obligations under the written and/or implied warranty, since Plaintiff and Nationwide Class members purchase Vehicles that did not have the promised performance, fuel-efficiency and emissions for which they paid, paid a premium for Volkswagen's "Clean Diesel" vehicles when they could have instead purchased less expensive vehicles that produced lawful emissions, and lost the opportunity to purchase other vehicles with lawful emissions.

96.     Plaintiff and the Nationwide Class is entitled to recover "damages and other legal and equitable relief" and "costs and expenses (including attorneys' fees based upon actual time expended)" as provided in 15 U.S.C. § 2310(d).

## COUNT IV –
## BREACH OF EXPRESS WARRANTY

97.     Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

98.     This Count is brought on behalf of Plaintiff and the Nationwide Class.

99.     Volkswagen made express warranties to Plaintiff and members of the Nationwide Class regarding the performance, fuel-efficiency, and emissions of its TDI Clean Diesel Vehicles.

100.     However, Volkswagen knew or should have known that the representations, descriptions, and promises about the Vehicles' performance, fuel-efficiency and emissions were false because it installed the Defeat Device in the Vehicles.

101.     Plaintiff and Nationwide Class members purchased Volkswagen's Vehicles in the belief that they conformed to the express warranties that were made by Volkswagen.

102.     Volkswagen breached the express warranties made to Plaintiff and Nationwide Class members by failing to supply Vehicles that conformed to the warranties Volkswagen

made. Specifically, the Vehicles did not provide the warranted performance, fuel-efficiency and emissions because the Vehicles contain a Defeat Device causing the emissions to be as promised and warranted only when the Vehicles are undergoing emissions testing, and not while the Vehicles were operating normally.

103. Plaintiff and Nationwide Class members paid money for the Volkswagen Vehicles. However, Plaintiff and Nationwide Class members did not obtain the full value of the advertised Vehicles. If Plaintiff and Nationwide Class members had known the truth about the Vehicles (that they contained an intentionally installed Defeat Device), Plaintiff and Nationwide Class members would have not have purchased the Vehicles, or would not have been willing to pay the premium price charged for the Vehicles. Accordingly, Plaintiff and Nationwide Class members have suffered injury in fact and lost money or property as a result of Volkswagen's wrongful conduct.

104. Plaintiff and Nationwide Class members are entitled to recover damages, punitive damages, equitable relief such as restitution and disgorgement of profits, and declaratory and injunctive relief.

## COUNT V –
## UNJUST ENRICHMENT

105. Plaintiff incorporates by reference the allegations contained in the foregoing paragraphs of this Complaint.

106. This Count is brought on behalf of Plaintiff and the Nationwide Class in the alternative.

107. Volkswagen's conduct in enticing Plaintiff and Nationwide Class members to purchase its TDI "Clean Diesel" Vehicles through the use of deceptive advertisements and unlawful actions as described throughout this Complaint is unlawful because Volkswagen's

promises of certain performance, fuel-efficiency and emissions are untrue.

108. Volkswagen took monies from Plaintiff and Nationwide Class members for Vehicles promising certain performance, fuel-efficiency and emissions even though the Vehicles sold do not have the promised performance, fuel-efficiency and emissions.

109. Volkswagen has been unjustly enriched at the expense of Plaintiff and Nationwide Class members as a result of its unlawful conduct alleged herein, thereby creating a quasi-contractual obligation on Volkswagen to restore these ill-gotten gains to Plaintiff and Nationwide Class members.

110. As a direct and proximate result of Volkswagen's unjust enrichment, Plaintiff and Nationwide Class members are entitled to restitution or restitutionary disgorgement in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and on behalf of the other members of the Nationwide Class and Pennsylvania Subclass requests an award and relief as follows:

A. An order certifying that this action is properly brought and may be maintained as a class action, that Plaintiff be appointed Nationwide Class Representative and Pennsylvania Subclass Representative, and Plaintiff's Counsel be appointed Counsel for the classes.

B. An order awarding Plaintiff, Nationwide Class and Pennsylvania Subclass members actual, statutory, punitive or any other form of damages for all Counts for which they are available.

C. An order awarding Plaintiff, Nationwide Class and Pennsylvania Subclass members restitution, disgorgement or other equitable relief for all Counts for which they are available.

D. Other statutory penalties for all Counts for which they are available.

E. Punitive Damages for all Counts for which they are available.

F. An order requiring Volkswagen to adequately disclose and remedy the Defeat Device in its Vehicles and an order enjoining Volkswagen from incorporating a Defeat Device in its vehicles in the future.

G. An order awarding Plaintiff his costs of suit, including reasonable attorneys' fees and pre- and post-judgment interest.

H. An order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Volkswagen as a result of the deceptive, unfair and unlawful conduct alleged herein.

I. Such other and further relief as may be deemed necessary or appropriate.

## JURY DEMAND

Plaintiff demands a trial by jury on all counts so triable.

Dated: September 29, 2015

Respectfully submitted,

J. Gerard Stranch, IV (BPR # 23045)
Joe P. Leniski, Jr. (BPR # 22891
Benjamin A. Gastel (BPR # 28699)
**BRANSTETTER, STRANCH
AND JENNINGS, PLLC**
227 Second Avenue North
Nashville, TN 37201
Telephone: (615) 254-8801
Facsimile: (615) 250-3937

Joseph N. Kravec, Jr. (*pro hac* to be filed)
Wyatt A. Lison (*pro hac* to be filed)
**FEINSTEIN DOYLE PAYNE
& KRAVEC, LLC**
429 Forbes Avenue
Allegheny Building, 17th Floor
Pittsburgh, PA 15219
Telephone: (412) 281-8400
Facsimile: (412) 281-1007

*Attorneys for Plaintiff*